# UNITED STATES DISTRICT COURT

### for the

### Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information Associated with Apple iCloud Account<br>bigchop55@icloud.com, That Is Stored at Premises<br>Controlled by Apple, Inc. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 1: 25 MJ 04 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922(a)(1)(A) | Dealing in firearms without a license |
| 18 USC 922(a)(6) | Providing false statements to an FFL |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Jonah E. James
*Applicant's signature*

_____
Jonah E. James, Special Agent
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 2/28/2025

_____
*Judge's signature*

City and state: Winston-Salem, North Carolina

_____
Joi Elizabeth Peake, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| In the Matter of the Search of: Information Associated with Apple iCloud Account bigchop55@icloud.com, That Is Stored at Premises Controlled by Apple, Inc. | Case No. 1:25MJ64 |
| --- | --- |

## AFFIDAVIT IN SUPPORT OF A
## SEARCH AND SEIZURE WARRANT

I, Jonah E. James, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Apple iCloud Account that is stored at premises owned, maintained, controlled, or operated by Apple, Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at 1 Apple Park Way, Cupertino, California 95014. The account, believed to be utilized by Cameron MCCAIN, is identified as: "bigchop55@icloud.com", herein the SUBJECT ACCOUNT. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information further described

in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and as such, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7). Therefore, I am empowered to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3. I have been employed as a SA with the ATF since May 2021. As an ATF SA, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and specialized training in the fields of firearms, explosives and arson, and Federal law and regulations pertaining thereto at the ATF National Academy. Since 2024, I have been assigned to the Raleigh Group I, where my duties include the investigation and enforcement of violations of firearms laws, narcotics laws, and other associated violations encountered in the course of these duties. For my first three years with ATF, I was assigned to Atlanta Group I, which specialized in investigating domestic, both intrastate and interstate, and international firearms trafficking, as well as the burglary of firearms from Federal Firearms Licensees ("FFLs"). Prior to becoming an ATF SA, I was a SA for the Air Force Office of Special Investigations for four years, during which time I conducted

2

investigations involving drug use and distribution, aggravated assaults, sexual assaults, and child pornography, among other violations of the Uniform Code of Military Justice ("UCMJ") and Federal law. I also hold a bachelor's degree in criminology from West Virginia University in Morgantown, West Virginia.

4. During my tenure as an ATF SA, I have participated in investigations resulting in the arrest and prosecution of offenders at the federal level. As a part of those investigations, I have personally been involved in the execution of various types of both search and arrest warrants in which firearms that had been illegally purchased, possessed, and/or sold were seized. Based on that experience, and my training, I am aware of the following:

   a. Persons who purchase, possess, and/or sell firearms generally maintain records of their firearm transactions as items of value, and usually keep those in places that are readily accessible and under their physical control, such in their digital devices and/or in residences and vehicles that they control.

   b. It has been my experience that those who illegally purchase, possess, and/or sell firearms will keep the contact information of the individual who is supplying firearms and/or their "customers" for future purchases, sales, and/or referrals. Such information is also kept on digital devices, at residences, and in vehicles they control.

3

c. Correspondence between persons buying and selling firearms, including correspondence between co-conspirators in the dealing of firearms without a license, often occurs over phone calls, e-mail, text message, and social media messages to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. These messages will stay on the telephone until they are deleted by the user or by automatic processes which the user enabled.

d. In addition, it is common for individuals engaging in the unlawful sale of firearms to maintain on their digital devices photographs and/or video recordings of firearms they, or other individuals working with them, possess, as they may send these photos to each other to demonstrate the firearms in their possession and/or to facilitate sales or transfers of firearms. These photographs and recordings are often shared via social media, text messages, and over other messaging applications. Digital devices containing such evidence are kept on the person and in residences and vehicles owned or used by the person.

e. Individuals engaged in the illegal purchase or sale of firearms often use multiple digital devices and/or social media platforms.

4

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on my training and experience and the facts as set forth herein, I submit there is probable cause to believe that violations of 18 U.S.C. §§ 922(a)(1)(A) [Dealing in firearms without a license] and 922(a)(6) [Providing false statements to an FFL] have been committed by Cameron MCCAIN. As a result, probable cause also exists to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2711. 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) & 2703(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## FIREARMS TRAFFICKING TERMS

8. **Firearms Trafficking** – Firearms trafficking is the movement of guns from legal to illegal streams of commerce that occurs within states, across state lines, and across international borders. According to ATF data, from the

5

beginning of 2020 to the beginning of 2025, 116,323 firearms were purchased in North Carolina and were subsequently recovered by law enforcement. Of those 161,323 firearms, 91,768 (approximately 56.9%) were recovered in the state of North Carolina.

9. **Federal Firearms Licensee ("FFL")** - Any person, partnership, or business entity holding a valid license issued by ATF under the authority of 18 U.S.C. Chapter 44 that allows them, or their employees, to "engage in the business" of dealing, manufacturing, importing, or repairing firearms. The term also includes those persons who are pawnbrokers dealing in firearms. By law, all FFLs must keep records of their firearms transactions.

10. **ATF Form 4473, Firearms Transaction Record** - A form completed and maintained by all FFLs to document the transfer of firearm(s) to an unlicensed individual. The form is completed by both the purchaser and the FFL and contains identifying information concerning the purchaser, firearm, date of transfer, and FFL number. The primary purpose of the form is to determine the eligibility of the purchaser to legally acquire and possess firearms.

11. **National Instant Criminal Background Check System ("NICS")** - A national records system, operated by the FBI, that checks the background of every unlicensed person during the process of acquiring a

6

firearm from an FFL, for the purpose of preventing prohibited persons from acquiring firearms illegally.

12. **Time to Sale** - The period of time, measured in days, between a retail FFL's receipt of a firearm and the sale or transfer of that firearm. A short time to sale, particularly when a number of inexpensive or identical handguns are involved, may indicate the federally licensed firearms dealer is specifically ordering the firearms at the request of an illegal trafficker or is directly involved with illegal trafficking.

13. **Time to Crime ("TTC")/Time to Recovery** - The period of time, measured in days, between a firearm's acquisition from a retail market and law enforcement's recovery of that firearm during use, or suspected use, in a crime. A short time to crime usually means the firearm will be easier to trace; however, it is not necessarily an indicator of firearms trafficking. When several short time-to-crime traces involve the same individual or FFL, or when a short time-to-crime trace is coupled with multiple sales information, this may be an indication of illegal trafficking activity.

14. **Straw Purchase** - The acquisition of firearm(s) from an FFL by an individual (the "straw"), for the purpose of concealing the identity of the true intended receiver of the firearm(s). The "actual purchaser" is often the person who is prohibited from purchasing who seeks to obtain the firearm through the "straw purchaser."

15. **National Tracing Center ("NTC")** - The only facility/operation in the world that traces the history of firearms recovered in crimes and from juveniles for any Federal, State, or local law enforcement agency in the United States or abroad.

<u>PROBABLE CAUSE</u>

16. On November 17, 2023, ATF SA Lawrence Dickens and ATF Task Force Officer ("TFO") Justin Christy conducted a non-custodial interview of MCCAIN. MCCAIN related, in part, the following information:

    a. Prior to the interview, MCCAIN sent SA Dickens a list of firearms MCCAIN had purchased, as well as the disposition of the firearms. The list showed (3) firearms as stolen: a firearm bearing the S/N: TJZ83221, a firearm bearing the S/N: BYND545, and a Glock model 30S[1]. SA Dickens queried the firearms in a law enforcement database and determined they had not been reported stolen. Further, SA Dickens queried all of the firearms on the list provided by MCCAIN in the same law enforcement database and determined that no firearm listed by MCCAIN had been reported stolen.

---

[1] I have not found any ATF Forms 4473 supporting MCCAIN's purchase of these (3) firearms, meaning MCCAIN acquired those firearms from an FFL(s) where I do not know of any purchases previously made by MCCAIN, or they were acquired by MCCAIN on the secondary market in private sales.

8

b. MCCAIN brought (3) firearms to the interview to show SA Dickens and TFO Christy the serial numbers. MCCAIN claimed he did not know agents wanted to see the other firearms and they were locked up in a safe at his grandmother's residence. The (3) firearms MCCAIN brought with him were a Del-Ton, model DTI-15, .223 cal, S/N: DTI-S272413; a Glock, model 19, 9mm pistol, S/N: CAGY851; and a Glock, model 22, .40 cal pistol, S/N: BYNM597.

c. When asked if he had reported any firearms as stolen, MCCAIN told agents he had not reported any stolen because he knew who had stolen those firearms and he was attempting to get them back. MCCAIN claimed the firearms had been stolen sometime around October 13, 2023, when agents had first attempted to contact MCCAIN at his residence. SA Dickens advised MCCAIN to report any stolen firearms to police but cautioned MCCAIN to not make any false police reports.

d. MCCAIN listed the following firearms as sold:

- A Glock, model 19X, 9mm pistol, S/N: AHGC441, which was purchased by MCCAIN on June 26, 2023; and

9

- A Glock, model 33 Gen4, .357 cal pistol, S/N: BDHS831, which was originally purchased in 2017 by another individual in Henderson, NC; and

- A Glock, model 29 Gen4, 10mm pistol, S/N: BYWN931, which was purchased by MCCAIN on June 26, 2023; and

- A Glock, model 20 Gen5, 10mm pistol, S/N: BXZR315, which was purchased by MCCAIN on July 11, 2023; and

- A Taurus, model G2C, 9mm pistol, S/N: AEC227646, which was purchased by MCCAIN on June 10, 2023, and was later recovered by Greenville (NC) Police Department ("GPD") on July 5, 2024[2].

e. SA Dickens confirmed the Glock pistols, S/N: AHGC441 and S/N: BDHS831 had been sold to pawn shops in the area. SA Dickens noted the Glock pistol, S/N: BXZR315 was also listed as still being in MCCAIN's possession. When asked why that firearm was listed as being both sold and in his possession, MCCAIN stated he had probably sold that firearm but wrote it down wrong when making a list. SA Dickens noted the Taurus

---

[2] See paragraph 25(a) infra for additional details surrounding the recovery of the Taurus, model G2C, 9mm pistol, S/N: AEC227646 by law enforcement.

pistol, S/N: AEC227646 was listed as having a corresponding bill of sale, but MCCAIN did not produce a bill of sale to show agents.

f. SA Dickens asked MCCAIN about (3) specific firearms that were listed as being in his possession but had already been recovered and traced by law enforcement. MCCAIN stated no firearms had ever been returned to him by law enforcement agencies.

- SA Dickens asked about a Glock, model 48, 9mm pistol, S/N: BXUU475. This firearm was recovered on March 16, 2023, by Cary (NC) Police Department[3] ("CPD"). MCCAIN stated he did not know the individual from whom the firearm was recovered.

- SA Dickens asked about a Glock, model 19, 9mm pistol, S/N: BXZF749. This firearm was recovered on March 31, 2023, by Durham (NC) Police Department[4] ("DPD"). MCCAIN stated the individual from whom that firearm

---

[3] See paragraph 25.l infra for additional details surrounding the recovery of the Glock, model 48, 9mm pistol, S/N: BXUU475 by law enforcement.
[4] See paragraph 25.k. infra for additional details surrounding the recovery of the Glock, model 19, 9mm pistol, S/N: BXZF749 by law enforcement.

was recovered was his brother, and he had given his brother permission to possess that firearm.

- SA Dickens asked about a Glock, model 20 Gen5, 10mm pistol, S/N: BYVX837. This firearm was recovered on February 17, 2023, by Burlington (NC) Police Department[5] ("BPD"). MCCAIN initially stated he did not know the individual from whom the firearm was recovered, but later stated he had gone to high school with that individual. MCCAIN stated he did not know how that individual came into possession of that firearm and MCCAIN had not given him permission to possess it.

17. On January 30, 2025, I reviewed copies of ATF Forms 4473 completed by Cameron MCCAIN during his purchase of firearms from (6) FFLs:

   a. Academy Sports + Outdoors #308, an FFL located in Burlington, NC;

   b. AJ Guns LLC, an FFL located in Knightdale, NC;

   c. Bull City Armory, an FFL located in Durham, NC;

---

[5] See paragraph 25.m infra for additional details surrounding the recovery of the Glock, model 20 Gen5, 10mm pistol, S/N: BYVX837 by law enforcement.

d. Carolina Gunrunners LLC, an FFL located in Raleigh, NC;

e. Durham Gunsmithing/Bull City Armory, an FFL located in Durham, NC; and

f. Triangle Shooting Academy, an FFL located in Raleigh, NC.

Academy Sports + Outdoors #308, Bull City Armory, and Durham Gunsmithing/Bull City Armory are located in the Middle District of North Carolina ("MDNC"), while AJ Guns LLC, Carolina Gunrunners LLC, and Triangle Shooting Academy are located in the Eastern District of North Carolina ("EDNC").

18. According to the ATF Forms 4473 I reviewed, MCCAIN purchased at least (28) firearms from the (6) above-listed FFLs during an approximately (9) month time period, from October 17, 2022, to July 22, 2023. (17) of those firearms were Glock pistols, and throughout this period, MCCAIN purchased multiple Glock pistols of the same model. Based on my training and experience, Glock pistols are a commonly trafficked make of firearm due to their ability to be outfitted with a type of Machinegun Conversion Device ("MCD") known as a "Glock switch"[6].

---

[6] A "Glock switch" is a common term for a machinegun conversion device ("MCD") that can be installed onto Glock-style pistol slides. Once properly fitted to a Glock-style pistol slide, the previously semi-automatic pistol becomes capable of firing fully automatic and thus qualifies as a "machinegun" under 26 U.S.C. § 5845(b) because it is a combination of parts designed and intended solely and exclusively for use in converting a firearm into a fully automatic firearm.

19.    On each of the ATF Forms 4473 I reviewed, MCCCAIN checked "Yes" next to question 21.a, "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.**"

20.    Based on my training and experience, I know that FFLs will occasionally collect phone numbers and email addresses relating to a firearms purchaser, in addition to the standard biographical data mandated by the ATF Form 4473. On (9) of the ATF Forms 4473 that I reviewed, MCCAIN provided his email as the SUBJECT ACCOUNT. On (14) of the ATF Forms 4473 that I reviewed, MCCAIN provided his phone number as 919-510-1581.

21.    MCCAIN obtained these (28) firearms during purchases on (19) different days, purchasing as many as (4) firearms on the same day. MCCAIN purchased firearms from multiple FFLs on the same day on (2) occasions. Based on my training and experience, individuals engaged in straw purchasing and/or firearms trafficking activity often purchase multiple firearms at the same time, or from multiple FFLs on the same day, because they are fulfilling a "shopping list" provided to them by the actual purchaser(s) of the firearms. Based on my training and experience, the trends in MCCAIN's firearms

14

purchasing patterns are indicative of straw purchasing and/or firearms trafficking activity.

22.     According to ATF Firearms Trace Summaries, (16) of the (28) firearms known to have been purchased by MCCAIN have been recovered by law enforcement as abandoned property or in the possession of another individual due to their involvement in a crime.  Further, (13) of the (16) firearms recovered by law enforcement have been recovered in Durham, NC

23.     The (16) recovered firearms averaged (151) days between their purchase and recovery dates, a/k/a the TTC.  (14) of the (16) firearms were recovered with a TTC of less than (365) days.  Further, (2) of the firearms were recovered with a TTC of less than (30) days.  Based on my training and experience, firearms recovered with a TTC of less than (365) days are indicative of potential straw purchasing and/or firearms trafficking activity.  Moreover, firearms recovered with a TTC of less than (30) days are extremely indicative of straw purchasing and/or firearms trafficking activity.

24.     (5) of the (16) recovered firearms have been recovered from individuals who were less than (21) years of age at the time they were recovered.  While an individual between (18) and (21) years of age may acquire a pistol from an unlicensed individual who resides in the same state, an FFL may not sell a pistol to an individual the FFL knows or has reasonable cause to believe is under (21) years of age.  *See* 18 U.S.C. § 922(b)(1).

15

25.     The following is a summary of the recovery circumstances for each of the (16) firearms purchased by MCCAIN that have been recovered by law enforcement as abandoned property or in the possession of another individual due to their involvement in a crime.

a. On July 5, 2024, a Taurus, model G2C, 9mm pistol, S/N: AEC227646 was recovered byGPD in Greenville, NC, in the ENDC. This firearm was possessed by Man-1 at the time of his arrest. This firearm was reported stolen by Man-2 in Raleigh Police Department (RPD) Case # P23055012 (GPD Case # 2024-008203). This firearm was purchased by MCCAIN approximately (391) days earlier, on or about June 10, 2023, from Academy Sports + Outdoors #308 in Burlington, NC (MDNC).

b. On April 2, 2024, a Glock, model 43X, 9mm pistol, S/N: BYXH331 was recovered by the Durham (NC) County Sheriff's Office (DCSO) in Durham, NC, in the MDNC. This firearm was possessed by Man-3, a convicted felon, at the time of his arrest. Man-3 was charged with felon in possession of a firearm and multiple drug-related charges, including trafficking in opium or heroin and possession with intent to deliver cocaine, among others (DCSO Case # 24-04-0058). This firearm was purchased

approximately (523) days earlier, on or about October 27, 2022, at Triangle Shooting Academy in Raleigh, NC (EDNC).

c. On March 16, 2024, a Del-Ton, model DTI-15, .223 cal rifle, S/N: DTI-S269383 was recovered by DPD in Durham, NC, in the MDNC. DPD responded to a call about a party where the callers stated there were "lots of kids outside with guns." In total, DPD recovered (8) firearms, (7) of which had been abandoned, and (70) grams of marihuana inside the residence. DPD recovered an additional (101) grams of marihuana from an individual at the party who had attempted to elude police. Outside the residence, DPD recovered (3) abandoned Glock pistols with extended magazines, one of which had a Glock switch affixed, and an abandoned backpack that contained the aforementioned Del-Ton rifle. DPD seized a fifth firearm, another Glock pistol, from an individual at the party. Inside the residence, DPD located an abandoned Draco pistol in a backpack and (2) additional abandoned Glock pistols with extended magazines (DPD Case # 24-008292). (2) of the firearms seized had previously been reported stolen, but they were not reported stolen by MCCAIN. The Del-Ton rifle was purchased by MCCAIN approximately (338) days earlier, on or

about April 13, 2023, from Carolina Gunrunners in Raleigh, NC (EDNC).

d. On January 18, 2024, a Taurus, model G3, 9mm pistol, S/N: ADJ680934 was recovered by DPD in Durham, NC, in the MDNC. DPD officers apprehended Man-4 pursuant to an outstanding arrest warrant. Man-4 was known to DPD as being associated with the Eight Trey Gangster Crips gang. While surveilling Man-4, officers observed him meet with Man-5. Officers approached Man-4 and Man-5, and both attempted to flee. When officers apprehended Man-5, they seized a Glock pistol and (6.8) grams of crack cocaine from his person. Officers then located and apprehended Man-4, who was in possession of an electronic scale. Man-4 had thrown the aforementioned Taurus pistol into a pond while being pursued by officers, but officers later recovered it. According to DPD, both Man-4 and Man-5 are associated with the Reservoir St 600 Crips gang (DPD Case # 24-002145). The Taurus pistol was purchased by MCCAIN approximately (294) days earlier, on or about March 30, 2023, from Durham Gunsmithing/Bull City Armory in Durham, NC (MDNC).

e. On October 28, 2023, a Radical Firearms, model RF-15, .223 cal pistol, S/N: 23-032452 was recovered by DPD in Durham, NC, in the MDNC. A DPD officer was attempting to locate a vehicle suspected in a hit-and-run. The DPD officer noticed (2) males near the wood line, at which point one of the individuals fired at a vehicle on the roadway, and then the (2) individuals fled. A police K9 located the aforementioned Radical Firearms pistol and an additional Aero Precision AR-style firearm, both abandoned, but no suspects were located (DPD Case # 23-040798). The Radical Firearms pistol was purchased by MCCAIN approximately (145) days earlier, on or about June 6, 2023, from Bull City Armory in Durham, NC (MDNC).

f. On October 4, 2023, a Glock, model 21, .45 cal pistol, S/N: BYDN545 was recovered by DPD in Durham, NC, in the MDNC. DPD officers responded to a call about a shootout occurring. According to witnesses, multiple individuals had been engaged in shooting at each other, but there were no known injuries. Officers located the Glock pistol and attributed it to a man who was present at the scene and in possession of pistol magazines (DPD Case # 23-037621). This firearm was purchased by MCCAIN approximately (74) days earlier, on or

19

about October 4, 2023, at Triangle Shooting Academy in Raleigh, NC (EDNC).

g. On September 21, 2023, a Glock, model 17, 9mm pistol, S/N: BVZT931 was recovered by DPD in Durham, NC, in the MDNC. A DPD officer was patrolling a high crime area when the officer noticed an individual walking away at a rapid pace whom the officer believed to be carrying some kind of contraband. The individual then proceeded to take off sprinting and the officer pursued. The officer stopped pursuing when he noticed the individual no longer appeared to be carrying anything. The officer quickly located the aforementioned Glock pistol, but the individual was not apprehended (DPD Case # 23-035992). That firearm was purchased by MCCAIN approximately (146) days earlier, on or about April 28, 2023, at Bull City Armory in Durham, NC (MDNC)

h. On September 5, 2023, an Anderson Manufacturing, model AM-15, .223 cal pistol, S/N: 23005324 was recovered by DPD in Durham, NC, in the MDNC. No narrative was provided at this time, and no person was listed as a possessor of this firearm in the DPD report (DPD Case # 23-033719). That firearm was

purchased by MCCAIN approximately (60) days earlier, on or about July 7, 2023, at AJ Guns in Knightdale, NC (EDNC).

i. On August 16, 2023, a Glock, model 43X, 9mm pistol, S/N: CADX315 was recovered by DPD in Durham, NC, in the MDNC. DPD responded to a (2) vehicle accident, and when they arrived, the fire department indicated the aforementioned Glock pistol was located on the driver's side floorboard of one of the vehicles. The driver of that vehicle, Driver-1, insisted the firearm was not his, and a wallet belonging to another individual was found in the vehicle. Driver-1 was (18) years old at the time this firearm was seized. (DPD Case # 23-030828). That firearm was purchased by MCCAIN approximately (71) days earlier, on or about June 6, 2023, at Bull City Armory in Durham, NC (MDNC).

j. On May 3, 2023, a Glock, model 43X, 9mm pistol, S/N: BZWK891 was recovered by DPD in Durham, NC, in the MDNC. This firearm was possessed by Man-4, previously mentioned in paragraph 25.d., at the time of his arrest. Man-4 also possessed an Oxycodone pill bottle containing (2) pills and an electronic scale (DPD Case # 23-015737). This firearm was purchased by MCCAIN approximately (34) days earlier, on or

21

about March 30, 2023, from Durham Gunsmithing/Bull City Armory in Durham, NC (MDNC).

k. On March 31, 2023, a Glock, model 19, 9mm pistol, S/N: BXZF749 was recovered by DPD in Durham, NC, in the MDNC. No narrative was provided at this time in the DPD, but the possessor of the firearm listed on the ATF Firearm Trace Summary (DPD Case # 23-011552) was (18) years old at the time this firearm was recovered. That firearm was purchased by MCCAIN approximately (108) days earlier, on or about December 13, 2022, at Triangle Shooting Academy in Raleigh, NC (EDNC).

l. On March 16, 2023, a Glock, model 48, 9mm pistol, S/N: BXUU475 was recovered by CPD in Cary, NC, in the EDNC. This firearm was possessed by Man-5 at the time of his arrest. Man-5 was (20) years old at the time of his arrest with this firearm. Clark also possessed (15.8) grams of marijuana and distribution paraphernalia (CPD Case # 23-002476). This firearm was purchased by MCCAIN approximately (40) days earlier, on or about February 4, 2023, from Carolina Gunrunners in Raleigh, NC (EDNC).

m. On February 17, 2023, a Glock, model 20 Gen5, 10mm pistol, S/N: BYVX837 was recovered by BPD in Burlington, NC, in the MDNC. This firearm was possessed by Man-6, who was (18) years old at the time of his arrest with this firearm. Man-6 also possessed an additional Glock firearm not purchased by MCCAIN, approximately (3.8) lbs of marijuana, approximately (61.2) grams of psilocybin mushrooms, and distribution paraphernalia, among other items (BPD Case # 2023-00969). This firearm was purchased by MCCAIN approximately (28) days earlier, on or about January 21, 2023, from Durham Gunsmithing/Bull City Armory in Durham, NC (MDNC).

n. On February 11, 2023, an SCCY, model CPX-1, 9mm pistol, S/N: C431506, and a Taurus, model G3, 9mm pistol, S/N: ADD279436 were recovered by DPD in Durham, NC, in the MDNC. A DPD officer responded to a call of shots fired and located (6) individuals in a wooded area shooting firearms. As a result, (7) firearms were seized, (2) rifles and (5) pistols. One individual claimed ownership of a rifle and a pistol. MCCAIN was present and claimed ownership of the rest of the firearms. Of note, officers located a firearm with a Polymer-80 lower, with no serial number, partially concealed on the ground by leaves.

23

That firearm had a Glock switch affixed and an extended magazine (DPD Case # 23-005483). The SCCY pistol was purchased by MCCAIN approximately (77) days earlier, on or about November 26, 2022, at Durham Gunsmithing/Bull City Armory in Durham, NC (MDNC). The Taurus pistol was purchased by MCCAIN approximately (28) days earlier, on or about January 14, 2023, at Durham Gunsmithing/Bull City Armory in Durham, NC (MDNC).

o. On December 12, 2022, a Glock, model 19X, 9mm pistol, S/N: BXZG388 was recovered by DPD in Durham, NC, in the MDNC. This firearm was possessed by Man-7, who was (18) years old at the time of his arrest with this firearm. No other contraband was located in Man-7's vehicle (DPD Case # 22-044079). This firearm was purchased by MCCAIN approximately (56) days earlier, on or about December 12, 2022, from Triangle Shooting Academy in Raleigh, NC (EDNC).

26. On February 4, 2025, ATF Intelligence Research Specialist ("IRS") Sarah Haugen queried MCCAIN in the ATF Federal Licensing System ("FLS") and determined MCCAIN did not possess a license to deal in firearms.

27. On February 7, 2025, I reviewed DPD reports to determine if MCCAIN had ever reported any firearms stolen. On July 2, 2024, MCCAIN

24

reported to DPD that the previous day, he had returned to his vehicle to find someone had entered it while he was gone. MCCAIN stated he had stored (2) firearms in the rear of his vehicle, but upon discovering his vehicle had been entered, he went home to ensure that those firearms weren't in his safe at home. When officers asked MCCAIN why he had not called to report the firearms stolen as soon as he discovered they were missing, he initially stated July 1, 2024, was Sunday and he didn't think officers would respond. According to the report, when officers corrected MCCAIN that July 1st had been Monday, MCCAIN was unable to advise why the incident wasn't reported sooner. MCCAIN reported a Del-Ton, model DTI-15, .223 cal pistol, S/N: DTI-5272413[7] and a Glock, model 22, .40 cal pistol, S/N: BYNM597[8] as stolen (DPD Case # 24-020264). The Glock pistol, S/N: BYNM597 was recovered by DPD on October 10, 2023, during the execution of a residential search warrant following the arrest of suspect on an outstanding felony warrant (DPD Case # 24-031697).

Based on my training and experience, I know it is a common tactic for individuals engaged in straw purchasing, dealing in firearms without a license,

---

[7] This firearm's serial number was actually DTI-S272413. Because the S/N was improperly given to DPD, it's entry into the national law enforcement database for stolen firearms would have been incorrect, and notification about the recovery of this firearm by law enforcement would be more difficult.

[8] These were (2) of the (3) firearms MCCAIN's brought to show agents proof of his possession when he was interviewed on November 17, 2023.

and/or firearms trafficking activity to report firearms to police as stolen after they have been sold, trafficked, or otherwise disposed of by the original purchaser as a way to insulate the original purchaser from additional scrutiny, should the firearms later be recovered by law enforcement.

## ABOUT APPLE[9]

28.     Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

29.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

> a. Apple provides email service to its users through email
>    addresses at the domain names mac.com, me.com, and
>    icloud.com.

---

[9] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c. iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity

27

apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on

desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

30.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

31.     Apple captures information associated with the creation and use of an¬ Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address,

and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status ¬¬of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

32. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

33.    Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

34.    Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud

31

Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

35. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

36. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of

criminal activity, including to communicate and facilitate the offenses under investigation.

37.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

38.     Account activity may also provide relevant insight into the account owner's intent as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or

consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

39.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

40.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

<u>AUTHORIZATION REQUEST</u>

41.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) as well as Federal Rule of Criminal Procedure 41.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 922(a)(1)(A) [Dealing in firearms without a license] and 922(a)(6) [Providing false statements to an FFL] have been committed by

34

Cameron MCCAIN. There is also probable cause to search the records described in Attachment A for evidence of this crime, as further described in Attachment B.

42. I further request that the Court direct Apple to disclose to the government any information described in Section I of Attachment B that is within their possession, custody, or control. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

This affidavit has been reviewed by Assistant United States Attorney Nicole DuPré.

Respectfully submitted,


/S/ Jonah James
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives


In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 28 day of February , 2025, at 5:06 a.m./p.m.

THE HONORABLE JOI ELIZABETH PEAKE
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF NORTH CAROLINA

35

ATTACHMENT A

**Property to be Searched**

This warrant applies to information associated with the following Apple iCloud Account, the SUBJECT ACCOUNT, that is stored at premises owned, maintained, controlled, or operated by Apple, Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at 1 Apple Park Way, Cupertino, CA 95014:

- iCloud Account assigned Apple Credential ID "bigchop55@icloud.com", and is believed to be utilized by Cameron MCCAIN

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Meta Platforms, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose to the government the following information to the government for each account listed in Attachment A, for the time period October 1, 2022, to February 4, 2025 in the form of the following:

a. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past

1

trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d. The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the

2

account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f. All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and capability query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My and

3

AirTag logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g. All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with AirTags, Location Services, Find My, and Apple Maps;

h. All records pertaining to the types of service used;

i. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j. All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 922(a)(1)(A) [Dealing in firearms without a license] and 922(a)(6) [Providing false statements to an FFL] that have been committed by Cameron MCCAIN and the SUBJECT ACCOUNT during the period between October 1, 2022, to February 4, 2025, in the form of following:

a. Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

b. the identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

c. any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

d. evidence that may identify any co-conspirators, accomplices, or aiders and abettors, including records that help reveal their whereabouts;

e. any records related to weapons acquisition or sales, including all communications between co-conspirators, accomplices, or aiders and abettors that began, ended, or took place during the time period of October 1, 2022, to February 4, 2025;

5

f. photographs and videos which evidence the commission of or involvement in the criminal offenses specified above and/or connection to co-conspirators, accomplices, or aiders and abettors in the investigation between the dates of October 1, 2022, to February 4, 2025;

g. any records that document preparatory steps taken to illegally acquire firearms for the time period of October 1, 2022, to February 4, 2025;

h. all the search and browsing history associated with the account as well as any news or media coverage, to the extent the data is related to weapons possession/sale, or preparatory steps for that offense, for the time period of October 1, 2022, to February 4, 2025;

i. contact information, including phone numbers and names, that were created, deleted, or existed in the cloud for the time period of October 1, 2022, to February 4, 2025;

j. the contents of any emails exchanged related to weapons possession/sale, or preparatory steps for that offense, including stored or preserved copies of emails associated with the account (including all draft emails and deleted emails) the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the

6

emails, and all attachment for the time frame of October 1, 2022, to February 4, 2025;

k. the contents of all instant messages and chat messages related to weapons possession/sale, or preparatory steps for that offense, that are associated with the account including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message that was a part of an instant message conversation between the dates of October 1, 2022, to February 4, 2025;

l. evidence of user attribution showing who used or owned the account at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history for the time period of October 1, 2022, to February 4, 2025;

m. records of IP addresses used for the time period of October 1, 2022, to February 4, 2025;

7

n. the contents of all files and other records related to weapons possession/sale, or preparatory steps for that offense, that are stored on iCloud including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs, and iCloud Keychain, and all images and videos for the time period of October 1, 2022, to February 4, 2025;

o. any and all "Backup Folders" related to weapons possession/sale, or preparatory steps for that offense, that may contain backups of the data being searched as set forth in this warrant for the time period of October 1, 2022, to February 4, 2025;

p. all records and information related to weapons possession/sale, or preparatory steps for that offense, regarding locations where the account was accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps, for the time period of October 1, 2022, to February 4, 2025; and

q. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, to the extent the data is related to illegal

8

acquisition and sale of firearms, preparatory steps for those offenses, or

conspirators for the time period of October 1, 2022, to February 4, 2025.


As used above, the terms "records" and "information" include all of the

foregoing items of evidence in whatever form and by whatever means they may

have been created or stored, including any form of computer or electronic

storage (such as flash memory or other media that can store data) and any

photographic form.